UNITY REAL ESTATE COMPANY,
Plaintiff,

v.

Marty D. HUDSON, et al., Defendants,

and

United States of America, Intervenor–
Defendant.

Civil Action No. 93–1802.

United States District Court,
W.D. Pennsylvania.

March 14, 1997.

Thomas Smock, David J. Laurent, Pittsburgh, PA, for Plaintiff Unity Real Estate.

Ralph A. Finizo, Pittsburgh, PA, for Defendant Trustees & Funds

Robert L. Eberhardt, Asst. U.S. Atty., for Intervenor U.S.A.

### *MEMORANDUM ORDER*

D. BROOKS SMITH, District Judge.

### I.  INTRODUCTION

This matter is currently before the Court on cross-motions for summary judgment.   In a published opinion and order, *Unity Real Estate Co. v. Hudson,* 889 F.Supp. 818 (W.D.Pa.1995), this Court granted a preliminary injunction in favor of plaintiff Unity Real Estate Co. ("Unity"), finding that Unity had demonstrated a likelihood of succeeding on the merits on its claim that an application of the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701–9722 (the "Coal Act") would effect an uncompensated

"taking" in violation of the Takings Clause of the Fifth Amendment.[1]

In its motion for summary judgment, Unity reiterates its takings claim, as well as its contention that the liabilities imposed upon it by the Coal Act give rise to due process violations, a claim that this Court rejected at the preliminary injunction stage. *Unity*, 889 F.Supp. at 824–25 (finding Congress had a rational basis for passing the legislation). Defendants, Trustees of the UMWA Combined Benefit Fund and the 1992 UMWA Benefit Plan, assert that new facts and subsequent appellate decisions addressing the Takings Clause issue, including a recent opinion by the Court of Appeals for the Third Circuit, *Lindsey Coal Mining Co. v. Chater*, 90 F.3d 688 (3d Cir.1996), compel a conclusion that the Coal Act, as applied, does not effect an uncompensated taking.

I agree with the Trustees that recent decisions from the Courts of Appeals and a more complete factual record require a re-examination of Unity's takings claim. Although it is undisputed that enforcement of the Coal Act in this instance will cause severe economic hardship, the current case law now establishes that the Trustees' motion for summary judgment should be granted.

## II. FACTUAL FINDINGS

### A. Unity and Its Related Companies

In their motion for summary judgment, the Trustees submit new facts regarding Unity and its related coal companies that have been obtained since the preliminary injunction. With a few exceptions, as noted, Unity does not dispute the following facts.

Incorporated in 1947 by members of the Jamison family, Unity currently owns a commercial building and parking lot in Greensburg, Pennsylvania. *Unity*, 889 F.Supp. at 821. With annual gross revenues of approximately $50,000 and a net worth of approximately $85,000, Unity only employs two individuals, an officer at a salary of $7,200 per year, and a janitor. *Id.*

In 1969, Unity became the surviving entity of the merger of three inactive coal companies: South Union Coal Company, Penn View Coal, and Stewart Coke & Coal. Unity is also a successor to two additional coal companies, Jamison Coal Company and Moremet Coal Company. *Unity*, 889 F.Supp. at 821.

The following is a description of the individual coal companies that were merged into or created by Unity.

### 1. South Union Coal Company

South Union was incorporated in 1922 by the Jamison family. From 1923 through 1961, the company operated two mines in Pennsylvania and West Virginia employing more than 100 UMWA-represented miners at each mine. (Def. facts ¶¶ 43, 44). South Union was signatory to the National Bituminous Coal Wage Agreements ("NBCWA") of 1947 through 1961. (Def. facts ¶ 45).[2] From 1923 to 1941, South Union was a member of the Western Pennsylvania Coal Operators' Association ("WPCOA"), and from 1943 to 1961, it was a member of the Northern West Virginia Coal Operators' Association ("NWVCOA"). (Def. facts ¶ 46). The latter association was a member of the Bituminous Coal Operators' Association, Inc. ("BCOA"). South Union earned a profit in every year from 1946 to 1960. (Def. facts ¶ 49).

In 1961, South Union closed down and remained idle until its merger with Unity in 1969. (Def. facts ¶ 51). At the time of the merger, Unity assumed all of the assets and liabilities of South Union. (Def. facts ¶ 52). Although South Union stopped making payments to the UMWA benefits funds at the time it ceased operations in 1961, it was aware that its former employees continued to receive benefits. (Def. facts ¶¶ 53, 54).

---

1. The Fifth Amendment states in relevant part: "No person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V.

2. In its Counter Statement of Material Facts, Unity cites this Court for the statement that South Union was a signatory member of the NBCWA for the years 1950, 1951, 1952, 195[5], 1956 and 1959. (Pl. facts ¶ 10). Most of Unity's facts are drawn from my opinion granting a preliminary injunction.

### 2. Penn View Coal

The parties have not provided much information on Penn View Coal. The Jamison family was the major stockholder of Penn View, a strip mining and mine equipment company. (Def. facts ¶ 55). Penn View merged into Unity in 1969. *Id.* The parties do not specify to which NBCWAs Penn View was a signatory. (Pl. objections to def. facts ¶ 2).

### 3. Stewart Coal & Coke

Stewart was incorporated by the Jamison family in 1949 and family members owned a majority of the stock. (Def. facts ¶ 56). Stewart operated both a coal mine and a coke manufacturing plant, employing approximately sixty UMWA-represented employees. (Def. facts ¶ 57). It had a representative on the WPCOA and made payments to the UMWA benefit funds from 1949 to 1958. (Def. facts ¶¶ 58–59). When it ceased operations in the late 1950s, Stewart stopped paying into the UMWA funds. Its former employees, however, continued receiving benefits. (Def. facts ¶ 60).

In 1970, Unity executed new promissory notes to the Jamison family to replace notes Stewart had given them in the amount of $212,857.70. Unity repaid approximately $80,000 of these notes in 1974 and 1975, $100,000 in 1992, and $52,000 in 1993. (Def. facts ¶¶ 95–98).

### 4. Jamison Coal Company

Jamison Coal Company was incorporated in 1958. Although the Jamison family controlled the company, Unity purchased more than 15% of its stock at the time of its incorporation. (Def. facts ¶¶ 62, 63). In addition, South Union purchased approximately 41.5% of the stock, Stewart approximately 9%, and members of the Jamison family bought approximately 32.2%. (Def. facts ¶¶ 64–66).

The Trustees assert that Jamison Coal was a signatory to the NBCWAs, but do not specify which years. Jamison Coal was a board member of the WPCOA. (Def. facts ¶ 68). The company paid into the UMWA Funds from 1961 to 1967, apparently pursuant to the NBCWAs. (Def. facts ¶ 69).

### 5. Moremet Coal

Unity purchased Moremet Coal Company in 1975 to mine the coal assets it had acquired by its merger with Stewart. (Def. facts ¶ 72). It was a wholly-owned subsidiary of Unity. Id. Moremet employed UMWA miners and made payments to the UMWA Funds, but maintained no other benefit plan. (Def. facts ¶¶ 73,74).

### 6. South Union Coal Company (West Virginia)

South Union–WV was incorporated in 1974 as a wholly-owned subsidiary of Unity. (Def. facts ¶ 75). From 1975 to 1981, South Union–WV operated the Edna, West Virginia coal mine formerly run by South Union–PA. (Def. facts ¶ 77). South Union–WV was a signatory to the 1974, 1978, and 1981 NBCWAs. (Def facts ¶ 76). As a member of both the NWVCOA and the WPCOA, South Union–WV had representatives on both boards. (Def. facts ¶¶ 78,79). David Jamison, Unity's current president, attended meetings of both boards on behalf of South Union–WV. (Def. facts ¶ 80).

South Union–WV employed approximately fifty-five UMWA miners and made payments into the UMWA Funds from 1975 to 1981. (Def. facts ¶ 81, 82). Pursuant to the 1978 NBCWA, South Union–WV provided individual retiree benefits to its former miners. (Def. facts ¶ 84). In 1981, South Union–WV declared liquidation bankruptcy. The bankruptcy court allowed South Union–WV to repudiate the 1981 NBCWA. (Pl.ob.¶ 4).

Unity advanced $243,500 to South Union–WV and paid $186,414 as guarantor on behalf of the company. Unity also indemnified David Jamison and his wife for loan guarantees they made on behalf of South Union–WV. (Def. facts ¶¶ 93, 94).

Following the bankruptcy, David Jamison notified the UMWA Funds that South Union Coal Company was no longer in business. He stated: "I am aware that the Trustees of the UMWA 1974 Benefit Trust will presently authorize payment of medical and other ben-

efits for eligible former employees of the South Union Coal company and their dependents according to the provisions of the amended 1974 Benefit Plan and Trust. I understand that payment of those benefits will be made in reliance upon this statement that South Union Coal Company is no longer in business." (Def. facts ¶ 88). From 1982 to 1995, Unity paid no federal tax on income of approximately $288,346 because of the carryover of net operating losses attributable to the coal mining operations of South Union–WV. (Def. facts ¶ 87).

## B. The Coal Act

The history of the Coal Act has been recited in detail in numerous opinions. *See, e.g., In re Chateaugay Corp.*, 53 F.3d 478, 485–86 (2d Cir.1995). I will only briefly outline the structure of the Act and its hierarchy of liability. Enacted in 1992 following a divisive coal strike over retiree benefits, the Coal Act's stated purpose was to "identify persons most responsible for [benefit] plan liabilities in order to stabilize plan funding and allow for the provision of health care benefits to retirees." Coal Industry Retiree Health Benefit Act of 1992, Pub.L. No. 102–486, § 19142, *reprinted in* 1992 U.S.C.C.A.N. 2776, 3037. A Combined Fund was created to provide benefits to coal industry retirees who, as of July 20, 1992, were eligible to receive benefits or were receiving benefits from an earlier fund. 26 U.S.C. § 9703. Congress created the 1992 UMWA Benefit Plan to "provide health benefits coverage to any eligible beneficiary who is not eligible for benefits under the Combined Fund." 26 U.S.C. § 9712(b)(1).

The Coal Act establishes a hierarchy of employers who are designated to pay into the Funds. First, the Secretary of Labor must identify retired coal miners and their dependents who were entitled to health care benefits under the 1974 Funds and assign those beneficiaries to NBCWA signatory coal operators, or related persons,[3] that have remained in business. 26 U.S.C. § 9706. Within that category, the Secretary must assign the beneficiaries to the coal mine operators that most recently employed them for at least two years, and were signatories to 1978 or later NBCWAs. 26 U.S.C. § 9706(a)(1). If no such operator exists, the Secretary then tries to assign the beneficiaries to a pre–1978 signatory operator that employed the beneficiary for the longest period of time. 26 U.S.C. § 9706(a)(3). For each beneficiary assigned to it, the operator must pay a premium to the Combined Fund. 26 U.S.C. § 9704(a).

Pursuant to the Coal Act, the Secretary of Labor initially assigned seventy-eight beneficiaries to Unity based on the employment of sixty-three miners by Unity or its related entities. The average length of employment of the sixty-three miners with Unity or the related coal companies was ten years. Thirty miners worked for the companies for more than ten years and thirteen worked for more than fifteen years. (Def. facts ¶¶ 104–06).

As of September 1995, Unity had seventy-four assigned beneficiaries and owed the Combined Fund $440,694 in unpaid premiums. Unity owed an additional $18,243 to the 1992 UMWA Plan for the benefits of a retired South Union–PA miner and his wife. (Def. facts ¶ 109).

## III. CONCLUSIONS OF LAW

### A. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The parties agree that there are no genuine issues of material fact and that summary judgment is appropriate.

### B. Due Process Challenge

■ Although this Court found at the preliminary injunction stage that Congress had

---

**3.** Unity qualifies as a "related person" under section 9701(c)(2) of the Act. Unity's liability arises because it is a successor in interest to signatory operators that are no longer in business.

a rational basis for enacting the Coal Act, *Unity,* 889 F.Supp. at 824–25, Unity renews its due process claim, this time asserting that the retroactive effects of the Coal Act give rise to a violation.

■ This is precisely the same argument that the Court of Appeals for the Seventh Circuit rejected in *Davon, Inc. v. Shalala,* 75 F.3d 1114, 1122 (7th Cir.1996). The Court agreed that the Coal Act, as applied to the plaintiffs, was retroactive. Retroactivity did not, however, require courts to exercise a greater degree of scrutiny in reviewing the legislation. On the contrary, courts examine due process challenges to retroactive laws as they do prospective ones by asking the same question: is the legislation justified by "a legitimate legislative purpose furthered by rational means"? *Id.* at 1123 *quoting General Motors Corp. v. Romein,* 503 U.S. 181, 191, 112 S.Ct. 1105, 1112, 117 L.Ed.2d 328 (1992).

Using this inquiry, the *Davon* Court concluded that Congress acted rationally in enacting the retroactive components of the Coal Act because of four grounds. "First, every NBCWA signatory company profited from the labor of its retired miners." *Id.* at 1124. "Second, every NBCWA signatory company shared some responsibility in creating a legitimate expectation among miners of lifetime health benefits." *Id.* at 1124–25. "Third, mandatory contributions from all NBCWA signatory companies were necessary to secure adequate funding for the Combined Fund." *Id.* at 1125–26. "Fourth, restricting the statutory obligation to fewer than all NBCWA signatory companies could have resulted in economic conflict in the coal industry." *Id.* at 1126.

Unity raises no new arguments that would dispute the conclusion that Congress acted rationally in giving the Coal Act retroactive effect. Since this Circuit has endorsed the views expressed in *Davon, Lindsey,* 90 F.3d

at 694, *Unity's* due process challenge is rejected.

### C. Takings Claim

■ The Takings Clause of the Fifth Amendment "is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 123, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). To evaluate a takings challenge to a statute, the Supreme Court has laid out a three-pronged analysis that must be conducted as an "ad hoc" factual inquiry into the circumstances of each case. *Connolly v. Pension Benefit Guaranty,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). Courts must give "particular significance" to three factors: (1) the economic impact of the regulation on the plaintiff; (2) the extent to which the statute has interfered with distinct investment-backed expectations; and (3) the nature or character of the government action. *Connolly,* 475 U.S. at 224–25, 106 S.Ct. at 1025–26.

Since the issuance of a preliminary injunction in this case, a number of appellate decisions from other circuits have fleshed out the takings analysis. *See, e.g., In re Blue Diamond Coal Co.,* 79 F.3d 516 (6th Cir.1996); *Davon,* 75 F.3d at 1114. The Court of Appeals for the Third Circuit has approved these decisions, noting that "[a]s with the Due Process challenge, every court of appeals to consider a 'takings' challenge to the Coal Act has rejected it. We endorse the reasoning of these cases." 90 F.3d at 695 (internal citations omitted).[4]

### 1. The Nature or Character of the Government Action

The *Davon* and *Blue Diamond* Courts analogized the character of the government action in the Coal Act to the Mutiemployer

4. The following is a list of the cases with their subsequent procedural history: *Davon, Inc. v. Shalala,* 75 F.3d 1114 (7th Cir.) *cert. denied,* —— U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996); *In re Blue Diamond Coal Co.* 79 F.3d 516 (6th Cir.1996) *cert. denied,* —— U.S. ——, 117 S.Ct.

682, 136 L.Ed.2d 608 (1997); *Barrick Gold Exploration, Inc. v..Hudson,* 47 F.3d 832 (6th Cir.) *cert. denied,* —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995); *In re Chateaugay Corp.,* 53 F.3d 478 (2d Cir.) *cert. denied,* —— U.S. ——, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995).

Pension Plan Amendments Act (the "MPPAA"), which the Supreme Court unanimously held did not effect a taking. *See Connolly*, 475 U.S. at 211, 106 S.Ct. at 1019. "Like the Coal Act, the MPPAA does not permit the government to 'physically invade or permanently appropriate any of the employer's assets for its own use." *Davon*, 75 F.3d at 1129 *quoting Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026. Instead, the "interference with the property rights of an employer arises from a public program that adjusts the benefits and burdens of economic life to promote the common good and ... does not constitute a taking requiring Government compensation." *Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026.

At the preliminary injunction stage, this Court stated that "the nature of the governmental action often 'blends' into its analysis of the economic *impact* of the governmental action on the claimant." *Unity*, 889 F.Supp. at 826. Legislation that goes too far may "be properly characterized as action by the government in which it 'permanently appropriate[s] ... the employer's assets for its own use." *Id.* at 827 *quoting Connolly*, 475 U.S. at 225, 106 S.Ct. at 1026; *see also Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). Thus, a full examination of the nature of the government action turns on an evaluation of the economic impact prong.

## 2. Economic Impact of the Government Regulation

In the employee benefits realm, the Supreme Court has broken down this prong into three more factors: (1) "mere diminution in the value of property" is insufficient to establish a taking; (2) the employer's liability must not be "out of proportion to [the employer's] experience" with the benefit plan; and (3) the legislation should contain provisions "that moderate and mitigate the economic impact of an individual employer's liability." *Concrete Pipe and Prods., Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 645, 113 S.Ct. 2264, 2291, 124 L.Ed.2d 539 (1993); *Connolly*, 475 U.S. at 225–26 & n. 8, 106 S.Ct. at 1026–27 & n. 8.

The *Davon* Court explained that the economic impact factor "turns on the question of proportionality." 75 F.3d at 1127. In that case, a consolidated appeal was taken by plaintiff coal companies that had signed the 1950 NBCWA, the reach-back date of the Coal Act. Because the *Davon* plaintiffs had an even more attenuated connection to the benefit plans than Unity, it is worth describing these companies in some detail.

• Templeton, closed its last mine in 1954 and was no longer engaged in any coal-related enterprise. A signatory to the 1950, 1951 and 1952, NBCWAs, it was assigned thirty-nine beneficiaries.

• Sherwood, sold its last mine in 1960 and was currently operating a business unrelated to coal. Sherwood signed the 1950, 1951, 1952, 1955, and 1958 NBCWAs. It was assigned four beneficiaries.

• Princeton stopped mining in 1966 and was also currently engaged in non-coal activities. Princeton was a signatory to the 1950 NBCWA, as well as the 1951, 1952, 1955, 1956 and 1958 agreements. Princeton was assigned 117 beneficiaries.

• Berwind signed the 1950, 1951, 1952, 1955, 1956, and 1958 NBCWAs. It closed its last mine in 1960; however, in 1963, the company merged with another coal company and its successor entity signed the 1968, 1971, 1974, 1978, and 1981 NBCWAs. Berwind was currently the parent to several coal companies. It was assigned 914 beneficiaries.

• Davon was the successor to the New York Coal Company, which mined from 1933 to 1954. New York was a signatory to the 1950, 1951 and 1952 NBCWAs. In 1954, New York sold its coal mining business to another company and agreed not to engage in coal-related operations. In 1957, New York became Davon, Inc. The Secretary assigned Davon ninety-eight beneficiaries.

The plaintiffs further pointed out that many of the beneficiaries assigned to them had only the weakest connections—some beneficiaries worked for less than a day at the assigned company. *Davon*, 75 F.3d at 1120. Thus, the companies contended that applying the Coal Act to them was an uncon-

stitutional taking, given their relative *inexperience* with the benefit plans.

The Seventh Circuit first explained that the "important question" was "whether the basis for regulating plaintiffs under the Coal Act—their participation in prior NBCWAs—is proportional to the economic impact caused by the Act." *Id.* at 1128. Rejecting the plaintiffs' argument that their experience was with earlier NBCWAs, not the ones that promised lifetime benefits, the Court reasoned:

> Each consecutive NBCWA, including those after 1974, accomplished the same end—to provide benefits to miners until the next NBCWA—using the same means—funding on a multi-employer basis. Nothing radical happened in 1974. As we stated in the due process context, the promise of lifetime benefits was not an unforeseeable inclusion in an NBCWA; every coal operator that participated in the multi-employer plans contributed directly to the retirees' legitimate expectations of lifetime benefits. Plaintiffs' 'experience with the plan[s]' that eventually became the Combined Fund is easily deduced on the facts of this case.

*Davon,* 75 F.3d at 1128.

In *Blue Diamond,* the coal company was in Chapter 11 bankruptcy and had ceased employing union miners in 1964. The company had terminated its obligations to the UMWA Fund that same year. The Secretary assigned 1400 beneficiaries to Blue Diamond. Although all 1400 had worked for the company at some point, they had retired from other operators. *Blue Diamond,* 79 F.3d at 520.

After rejecting a due process challenge, the Sixth Circuit addressed the company's takings claim, stating that the "proper inquiry under the economic impact prong of the takings inquiry in a multiemployer benefit plan context is whether the plaintiff's liability is proportionate to the plaintiff's experience with the fund at issue." *Id.* at 525. Applying this standard to Blue Diamond, the Court concluded that the company's

> liability under the Coal Act is at least roughly proportional to Blue Diamond's experience with the UMWA Fund. Nearly all of the approximately 1400 living beneficiaries assigned to Blue Diamond either

worked for Blue Diamond or were related to someone who worked for Blue Diamond, and Blue Diamond provided service credits to those employees. The beneficiaries assigned to Blue Diamond were assigned to Blue Diamond only after they could not be assigned to a signatory to a more recent NBCWA.

*Blue Diamond,* 79 F.3d at 525.

This Court's primary concern at the preliminary injunction stage was the apparent lack of proportionality between Unity's liability and its experience with the NBCWAs or the Benefit Trusts. *See Unity,* 889 F.Supp. at 830–31. However, under the reasoning of *Davon* and *Blue Diamond,* it is clear that the proper inquiry must be the relationship between the assigned beneficiaries and their employment by Unity or its related companies. Applying this analysis, Unity's liability is proportional.

During discovery, Unity produced employment records for 536 former employees of its related companies. Of these 536 former employees, 188 were identified as receiving, or as having received before their death, benefits from the UMWA Funds. Of this group, 120 are eligible to receive benefits, either for themselves or their dependents. As of September 1995, Unity has only been assigned seventy-four beneficiaries. Unity does not dispute that all of the retirees assigned to it were once employed by coal companies to which Unity is related, nor does Unity challenge the fact that the assigned beneficiaries worked for its related companies longer than any other signatory operator.

Instead, Unity would have this Court give it special treatment because it is a "related person," not a signatory operator. Congress specifically provided a hierarchy of assignments for imposing liability. Unity was assigned beneficiaries because its related companies employed the miners longer and more recently than any currently operating signatory operator. In *Davon,* liability was imposed upon "related persons" of coal companies that had ceased operations in the 1950s; in *Blue Diamond,* the Court upheld the assignment of beneficiaries to a company that had withdrawn from the UMWA in the

1960s. It cannot be said that Unity's experience with the Benefit Funds or the NBCWAs was any more attenuated.

Moreover, Unity cannot argue that it has not received any benefits from its relation to the coal companies. From 1982 to 1995, Unity paid no federal tax on income of approximately $288,346 because of the carryover of net operating losses attributable to the coal mining operations of South Union–WV. Apparently, Unity's owners decided that it was in their best interest to maintain the company as a successor in interest to the defunct coal companies. After receiving this "benefit," Unity is bound to accept the concurrent liabilities imposed by such a connection.

■ It is undisputed that enforcement of the Coal Act will have a severe economic impact on Unity, and this Court continues to have concern over the wisdom of legislation that may have the effect of driving a company into bankruptcy. I am persuaded, however, that even when a regulation results in a claimant's loss of property in its entirety, if the government does not appropriate the property for its own use, but instead acts to ensure the stability of a private fund, then no unconstitutional taking can be found. *See Connolly,* 475 U.S. at 225, 106 S.Ct. at 1026 ("Given the propriety of the governmental power to regulate, it cannot be said that the Takings Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another.").

This conclusion is consistent with a line of Supreme Court decisions which have distinguished between action taken by a government which results in the government's control and dominion over a property interest, and action which does not exert control or dominion over a property interest. *See United States v. General Motors Corporation,* 323 U.S. 373, 378, 65 S.Ct. 357, 359–60, 89 L.Ed. 311 (1945) (compensation for taking of leasehold limited to market value of lease and fixture and permanent equipment destroyed or depreciated and not to consequential damages such as loss of good will or injury to business); *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946) (military's easement of flight over real property was an exercise of complete dominion and control over the land which constituted a taking); *United States v. Central Eureka Mining Company,* 357 U.S. 155, 169, 78 S.Ct. 1097, 1104–05, 2 L.Ed.2d 1228 (1958) (inability to operate gold mine due to government order to close gold mine during World War II resulted in damages which were "incidental to the Government's lawful regulation" and did not effect a taking); and *Armstrong v. United States,* 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960) (transfer of marine vessel from builder to government effected a taking since it extinguished the supplier's materialmen lien).

The distinction made in the foregoing cases is significant because "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." *Armstrong,* 364 U.S. at 48, 80 S.Ct. at 1568–69. As the Supreme Court cautioned in *United States v. General Motors Corporation,* 323 U.S. at 378, 65 S.Ct. at 359–60, the "Fifth Amendment concerns itself solely with the 'property,' i.e., with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership." This holding was refined in *Armstrong,* which acknowledged "the difficulty of trying to draw the line between what destructions of property by lawful governmental actions are compensable 'takings' and what destructions are 'consequential' and therefore not compensable." 364 U.S. at 48, 80 S.Ct. at 1568. This rule that consequential damages do not constitute a compensable taking was embraced again in *Connolly* which noted that the economic impact of the MPPAA upon the employer was "not out of proportion to its experience with the plan, and the mere fact that the employer must pay money to comply with the Act is but a necessary *consequence* of the MPPAA's regulatory scheme." 475 U.S. at 226, 106 S.Ct. at 1026 (emphasis added).

I agree that Unity's assessment under the Coal Act yields a harsh result. Yet it is a result—a consequence—of an otherwise lawful government regulation, and in no way flows from the exertion of control by the government over a property interest held by

Unity. As such, the nature of the governmental action and the economic impact of the regulation weigh in favor of finding that the Coal Act, as applied to Unity, does not offend the Fifth Amendment.

### 3. Reasonable Investment–Backed Expectations

As to the plaintiffs' reasonable investment-backed expectations, the *Davon* Court framed the issue as "whether the plaintiffs had a 'reasonable expectation that [they] would not be faced with liability for promised benefits.'" *Davon*, 75 F.3d at 1128 *quoting Concrete Pipe*, 508 U.S. at 644–48, 113 S.Ct. at 2291–92. The *Davon* Court held that they did not. First, the government had a long history of intervening in the coal industry. Second, from 1950 onward coal companies "substantially participated in a system that provided continuous benefits and created legitimate expectations that such provisions would not cease." *Id.* at 1129. Thus, "[a]ny expectation that [the companies] could never be held liable for retired miners' health benefits, in light of their participation in the NBCWAs, was not reasonable." *Id.*

The *Blue Diamond* Court also held that the Coal Act did not interfere with reasonable investment-backed expectations. *Blue Diamond*, 79 F.3d at 525. As in *Davon*, the Court cited the federal government's pervasive regulation of the coal mining industry and the coal operator's participation in the "NBCWA system that fostered UMWA members' legitimate expectations of lifetime benefits." *Id.*

As signatories to at least two NBCWA agreements that explicitly promised lifetime benefits, Unity's related companies had more reason to expect some government enforcement in such a heavily regulated industry than the *Blue Diamond* or *Davon* plaintiffs. None of those plaintiffs signed an NBCWA that contained express references to benefits "for life," yet both the Sixth and Seventh Circuits held that the companies had substantially participated in a system that fostered the legitimate expectation of lifetime benefits. *See Davon*, 75 F.3d at 1129; *Blue Diamond*, 79 F.3d at 516. Given the holdings of *Davon* and *Blue Diamond*, and their

adoption by the Third Circuit in *Lindsey*, at 695, it cannot be said that Unity had a reasonable expectation of avoiding liability.

### IV. CONCLUSION

A takings challenge to legislation requires a fact-specific analysis of the circumstances of each case. At the preliminary injunction stage, this Court was faced with a sparse factual record and limited case law interpreting the constitutionality of the Coal Act. Since that time, a more factually developed record, and decisions from the Court of Appeals for the Seventh, Sixth, as well as the Third Circuits, lead to the conclusion that the Coal Act, as applied to Unity, does not violate due process nor effect an unconstitutional taking.