**MARY HELEN COAL CORP., Plaintiff,**

v.

**Mary D. HUDSON, Michael H. Holland, Thomas O.S. Rand, Elliot Segal, Carlton R. Sickles, Gail R. Wilensky, and William P. Hobgood, as Trustees of the United Mine Workers of America Combined Benefit Fund, and Mary D. Hudson, Michael H. Holland, Thomas F. Connors, and Robert Wallace, Trustees of the 1992 United Mine Workers of America Benefit Plan, Defendants.**

Civil Action No. 3:97CV71.

United States District Court, E.D. Virginia.

Aug. 28, 1997.

John Lyons Marshall, Jr., Betty S.W. Graumlich, Patrick Michael McSweeney, McSweeney, Burtch & Crump, Richmond, VA, for Mary Helen Coal Corp.

Samuel Morton Brock, III, Mays & Valentine, Richmond, VA, John Mills Barr, Morgan, Lewis & Bockius, Washington, DC, Larry D. Newsome, UMWA Health & Retirement Funds, Washington, DC, John R. Mooney, Mooney, Green, Baker, Gibson and Saindon, Washington, DC, Peter Buscemi, Morgan, Lewis & Bockius, Washington, DC, for Marty D. Hudson, Michael H. Holland, Thomas O.S. Rand, Elliott A. Segal, Carlton R. Sickles, Gail R. Wilensky, Thomas F. Connors, Robert Wallace, William P. Hobgood.

## MEMORANDUM OPINION

RICHARD L. WILLIAMS, Senior District Judge.

This matter is before the Court on cross motions for summary judgment. Plaintiff Mary Helen Coal Corporation ("Mary Helen") brought a declaratory judgment action asking the Court to declare the Coal Industry Retiree Health Benefit Act of 1992, 26 U.S.C. §§ 9701 *et seq.* (the "Coal Act") unconstitutional as it applies to Mary Helen. The Defendants, the Trustees of the United Mine Workers of America 1992 Benefit Plan ("the Trustees") filed a motion for summary judgment and Plaintiff filed a cross motion for summary judgment.

At the heart of the dispute is the constitutionality of the Coal Act as it applies to Mary Helen. The Coal Act seeks to ensure the continuation of health benefits for tens of thousands of retired coal miners and their dependents. It does so by spreading the cost of such care among all employers that have in the past employed these miners and voluntarily participated in collectively bargained multiemployer plans for the provision of health care to coal industry retirees.

Plaintiff Mary Helen argues that the Coal Act, as it applies to Mary Helen, violates the Due Process Clause and the Takings Clause of the Fifth Amendment to the United States Constitution. Plaintiff asks the Court (1) to enjoin the Trustees and all other related parties from enforcing the Coal Act against Mary Helen; (2) to award Mary Helen judgment for payments it previously made under protest in response to assessments required under the Coal Act; and (3) to provide such further relief, including attorneys' fees and costs, as may be "equitable and just."

For the reasons stated below, plaintiff's prayer for a declaratory judgment that the Coal Act is unconstitutional is DENIED. Plaintiff's cross motion for summary judgment is also DENIED. Moreover, plaintiff's request that the Court enjoin the Trustees and all other related parties from enforcing the Coal Act against Mary Helen is DENIED. Finally, all forms of monetary and other relief that plaintiff seeks in this lawsuit are summarily DENIED.

For the reasons stated below, defendant's motion for summary judgment is GRANTED. In accordance with this ruling, Mary

Helen is ordered to pay all monies that it currently owes to the Combined Fund under the applicable statutory mandates. These monies may include but are not limited to outstanding interest, liquidated damages and attorney's fees and are due and payable immediately. Finally, Mary Helen is required to make and continue to make each monthly payment to the Combined Fund according to its obligations under the relevant statutory provisions. This case is hereby DISMISSED WITH PREJUDICE as to all plaintiffs and defendants.

### Historical Background

The allocation of health benefits for retired coal mine workers and their dependents has been a divisive issue in labor-management relations in the coal industry. The United Mine Workers of America ("UMWA") is a labor organization representing coal miners throughout North America. The Bituminous Coal Operators' Association ("BCOA") is a multiemployer bargaining association that represents various coal operators in collective bargaining with the UMWA. For over 40 years, the UMWA and BCOA have entered into a series of collective bargaining agreements known as National Bituminous Coal Wage Agreements ("NBCWAs"). Each NBCWA required signatory coal operators to provide health benefits for both active and retired miners and their dependents through multiemployer benefit plans.

The first of these plans was the Krug–Lewis Agreement. This agreement was reached after President Harry Truman authorized Secretary of the Interior Julius Krug to seize the coal mines and negotiate a truce between the striking UMWA and the bituminous coal operators. The Krug–Lewis Agreement created two new benefit plans: the United Mine Workers of America Welfare and Retirement Fund (the "1946 W & R Fund") and the United Mine Workers of America Medical and Hospital Fund (the "UMWA M & H Fund"). These funds were designed to provide economic and medical relief to miners, their dependents and their survivors. Shortly after these 1946 funds commenced operations, the UMWA and the bituminous coal industry reached a new collective bargaining agreement, effective May 1, 1947. Like the plans preceding it, this fund was established to provide monetary and medical relief to UMWA miners and their dependents. By the end of 1948, the 1947 Fund had provided medical benefits to more than 250,000 coal miners and their families in 26 states. In March, 1950, the UMWA Welfare and Retirement Fund of 1950 replaced the 1947 Fund. The 1950 Fund was established to continue providing pension and health benefits to UMWA miners and their dependents and to introduce a comprehensive hospital and medical care program. This program provided for the payment of unlimited hospitalization and medical care for (1) working and unemployed miners; (2) working and unemployed miners' wives and dependent children; (3) retired miners and their wives; (4) widows of deceased miners; and (5) relatives of deceased miners who cared for the miners' orphaned children and retired miners and their wives. During the 28 years of its existence, the 1950 Fund and its predecessors collected approximately $3.9 billion in hospital and medical care benefits, $283 million in survivors and other related benefits, and approximately $2 billion in pension benefits.

In 1974, BCOA and the UMWA divided the 1950 Fund into four separate multiemployer plans. Two of the plans provided *pension* benefits to retired miners; the other two provided *health* benefits to retired miners. One of the health benefit plans offered medical assistance to miners who retired before 1976 (the "Pre–1976 Plan"); the other health plan provided a similar portfolio of medical assistance to miners who retired after 1976 or remained actively employed (the "Post–1976 Plan"). In 1978, the UMWA and BCOA restructured the Post–1976 Plan to embody an agreement reached between miners and their employers that signatory employers would establish individual employer health plans to provide benefits to their active employees and retirees. This plan is called the 1978 NBCWA.

During the last ten years, the Pre–1976 Plan and the Post–1976 Plan have experienced serious financial problems. Numerous coal companies that had signed the 1978

NBCWA sought to terminate their participation in the Pre- and Post–1976 plans. To do so, they sought to "dump" the retirees who were in their individual employer plans into the Post–1976 Plan and abandon their contribution obligations altogether. This activity forced the remaining signatories of the NBCWAs to pay higher contributions in order to finance coverage for retirees who had been abandoned by their former employers.

### The Coal Act

By the late 1980s, escalating health care costs and the benefit funds' increasing inability to provide adequate benefits for eligible recipients caused uncertainty and instability in the coal mining workforce. When labor disputes and unrest had escalated to the point of threatening the economies of several coal-producing states the Secretary of Labor appointed a commission to analyze the retiree heath care crisis. The commission found a steady increase in the number of "orphaned" retirees and a hastily eroding funding base for providing these individuals with health and pension benefits. At the termination of the commission's investigation, the commission concluded that the continued delivery and financing of health care in the coal industry depended on the imposition of a statutory mandate upon coal operators to contribute to health benefit funds.

Congress' response to this recommendation was its passage of the Coal Industry Retiree Benefit Act of 1992 ("Coal Act"), 26 U.S.C. §§ 9701 *et seq.*—the statute that lies at the heart of this case. Under this Act, Congress created two trust funds to provide health care benefits to retired miners and their dependents—the *Combined Fund* and the *1992 Plan.* The Combined Fund provides health and death benefits to coal industry retirees who, as of July 20, 1992, were eligibly receiving benefits from the UMWA 1950 or 1974 Benefit Trusts. The 1992 Plan was designed to provide benefits to eligible retirees who are not beneficiaries of the Combined Fund and who are not receiving health care coverage directly from their former employers. For the purposes of this case, Mary Helen has obligations under the Coal Act to make payments to the Combined Fund. It

has no legal or monetary obligations to the 1992 Fund.

The Coal Act provides that coal operators who had previously contributed to the UMWA Trusts pursuant to collective bargaining agreements, including Mary Helen, are required to finance the Combined Fund by paying annual premiums. By so imposing these financing requirements on current and former NBCWA coal operators, the Coal Act embodies four Congressional objectives: (1) to make no attempt to rewrite the collective bargaining agreements to penalize such conduct or to readjust the contractual rights and liabilities of the parties to the NBCWAs; (2) to effectuate a "pay for your own" policy by "assigning" companies financial responsibility for their own retirees in the Combined Fund; (3) to implement Congress' decision that financing health care for "orphaned" retirees should be shared by the employers who voluntarily participated in the UMWA multiemployer health benefits system; and (4) to close loopholes through which companies like Mary Helen have jumped to avoid their obligations to facilitate retiree health care.

### Factual Background

Mary Helen has been involved in the coal mining industry since 1921. It engaged in actual coal mining until 1963, and leased its property thereafter to a series of companies who continued to mine the land. Under the terms of the leases, each company was required to pay a royalty for each ton on coal mined and a wheelage payment for each ton of coal transported across Mary Helen's property. During the years when Mary Helen leased its land to these companies, Mary Helen's chief source of income was these royalties and wheelage payments. Between 1963 and 1992, Mary Helen received royalty and wheelage payments totaling approximately $11,000,000.

During the years preceding 1963, Mary Helen was a signatory and active contributor to several multiemployer plans referenced in the previous section. Among these were the Krug–Lewis Agreement, the 1946 W & R Fund, the 1950 NBCWA. In 1963, Mary Helen terminated its coal mining operations for financial reasons and assigned all of its

coal-related rights to another coal mining company. Mary Helen urges the court that its departure from the coal mining industry was because it was unable to produce coal profitably. The defendant trustees, on the other hand, urge the court that Mary Helen so exited in order to avoid the financial obligations incumbent upon them by statute to contribute to the health and pension funds of retired coal mine workers.

By 1974 at least sixty-one of Mary Helen's former employees had become eligible for pension payments and health benefits. For more than twenty years, these beneficiaries received comprehensive health and medical coverage from the UMWA Trusts that was paid for entirely by coal operators other than Mary Helen. Mary Helen responded to the mandates of the Coal Act by taking further preventive measures to avoid making the required payments. Less than six months after Mary Helen mailed its first assessment of Coal Act premiums, Mary Helen vice president (and largest shareholder) compared the beneficiaries of the monies to scavengers, saying that "If miners are going to pick our bones shareholders should get some also. We are going to try to see that our stockholders get everything they can out of the company and that we don't go down the drain."

On March 12, 1996, Mary Helen's shareholders voted to cease making any payments to the Combined Fund under the Coal Act. As of June 30, 1997, Mary Helen's total delinquency to the Combined Fund stood at $617,257.81—excluding interest and liquidated damages.

### The Complaint and Cross Motions for Summary Judgment

The Mary Helen Coal Corporation ("Mary Helen") alleges that it has not engaged in coal mining since 1963 and has insignificant income from coal-related assets. Mary Helen further alleges that the only agreement with the United Mine Workers of America, AFL–CIO ("UMWA") provided that Mary Helen's obligations to pay for retiree health benefits would cease upon its cessation of coal mining or upon the termination of that agreement. Accordingly, Mary Helen has

made no contributions to the UMWA from 1964 through 1992.

In 1992, Congress enacted the Coal Act. Pursuant to the mandates of this Act, the defendants have demanded that Mary Helen make health benefit payments for each year beginning in 1993. Mary Helen alleges that these assessments will render it insolvent, are in excess of any amount of income that can ever reasonably be earned on Mary Helen's assets and will result in a "complete and uncompensated taking" of those assets. Mary Helen further alleges that because Mary Helen neither engaged in coal mining nor employed coal miners since 1963, has no significant income from coal-related assets, and "contributed in no way to any legitimate expectation of lifetime benefits for UMWA retirees or their dependents," the imposition of these monetary assessments is "arbitrary, irrational, and contrary to the rationale of the Coal Act."

For these reasons, Mary Helen seeks (1) a declaration pursuant to 28 U.S.C. § 2201 that the Coal Act, as applied to Mary Helen, violates the Takings Clause and the Due Process Clause of the Fifth Amendment; (2) an injunction restraining the defendants and all others from enforcing the Coal Act against Mary Helen in any respect; and (3) reimbursement pursuant to 29 U.S.C. § 1103 and common law of all payments made by Mary Helen in response to the mandates of the Coal Act.

In their motion for summary judgment, defendants argue that the Coal Act satisfies the requirements of the Due Process and Takings Clauses of the Fifth Amendment. Defendants also urge the Court to order Mary Helen to pay all monies it currently owes to the Combined Fund along with appropriate interest, liquidated damages, and attorney's fees. Moreover, defendants seek an injunction ordering Mary Helen to make each monthly payment to the Combined Fund as it becomes due.

In their cross-motion for summary judgment, Mary Helen implores the Court to find as a matter of law that as it applies to them, the Coal Act imposes an unduly harsh and oppressive burden that will ultimately bank-

rupt the company and completely reverse its legitimate, investment-backed expectations. For these reasons, Mary Helen urges, the 1992 Coal Act violates the Due Process and Takings provisions of the Fifth Amendment.

### Analysis

More than 30 federal judges have contemplated and upheld the constitutionality of the Coal Act. *See Barrick Gold Exploration, Inc. v. Hudson,* 823 F.Supp. 1395 (S.D.Ohio 1993), *aff'd,* 47 F.3d 832 (6th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995); *LTV Steel Co., Inc. v. Shalala,* 163 B.R. 955 (S.D.N.Y.1993), *aff'd,* 53 F.3d 478 (2d Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995); *Templeton Coal Co. v. Shalala,* 882 F.Supp. 799 (S.D.Ind.1995), *aff'd sub nom. Davon, Inc. v. Shalala,* 75 F.3d 1114 (7th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996); *Blue Diamond Coal Co. v. Shalala,* 174 B.R. 722 (E.D.Tenn.1994), *aff'd,* 79 F.3d 516 (6th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 682, 136 L.Ed.2d 608 (1997); *Lindsey Coal Mining Liquidating Trust v. Shalala,* 901 F.Supp. 959 (W.D.Pa.1995), *aff'd,* 90 F.3d 688 (3d Cir.1996); *Eastern Enterprises v. Shalala,* C.A. No. 93–12372–MLW (D. Mass. June 29, 1996), *aff'd sub nom. Eastern Enterprises v. Chater,* 110 F.3d 150 (1st Cir.1997); *Holland v. Imperial Colliery Co.,* C.A. No. 1:94–0793 (S.D.W.Va. December 7, 1995); *Holland v. Milburn Colliery Co.,* C.A. No. 1:94–0801 (S.D.W.Va. December 7, 1995); *Holland v. High–Tech Collieries, Inc.,* 911 F.Supp. 1021 (N.D.W.Va.1996). *Lone Star Steel Co. v. Chater,* C.A. No. 3:94–CV–652–R (N.D.Tex. Aug. 26, 1996); *Unity Real Estate Co. v. Hudson,* 977 F.Supp. 717 (W.D.Pa.1997); *appeal pending,* No. 97–3234 (3d Cir. docketed June 6, 1997); *Barnes & Tucker Co. v. Hudson,* C.A. No. 93–264J (W.D.Pa. March 18, 1997), *appeal pending,* No. 97–3236 (3d Cir. docketed June 6, 1997); *Bellaire Corp. v. Shalala,* C.A. No. 93–183 (D.D.C. April 21, 1997); *Associated Electric Cooperative, Inc. v. Hudson,* C.A. No. 93–944 (D.D.C. April 21, 1997); *Association of Bituminous Contractors v. Shalala,* C.A. No. 93–2304 (D.D.C. April 21, 1997).

Included among the decisions upholding the validity of the Coal Act are two decisions by separate panels of the Fourth Circuit. *See Holland v. Keenan Trucking, Inc.,* C.A. No. 2:93–1223 (S.D.W.Va. March 5, 1995), *aff'd,* 102 F.3d 736 (4th Cir.1996); *Carbon Fuel Co. v. USX Corp.,* 100 F.3d 1124 (4th Cir.1996). While both of these cases buttress the judgment of this Court, *Holland v. Keenan Trucking Co.* is of particular dispositive value in this case. Because the factual and analytical disposition of *Holland* tracks the case at hand with remarkable consistency, applying the analysis used in *Holland* to the case before this Court is conclusive.

In the *Holland* case, the U.S. District Court for the Southern District of West Virginia granted summary judgment in favor of the trustees of a coal mine worker retirement plan who brought action against a coal operator for unpaid premiums under the Coal Act. The coal operator appealed to the Fourth Circuit, arguing, among other things, that the Coal Act violates their right to due process under the Fifth Amendment. The *Holland* court addressed the appellant's due process claim by asserting that "[i]t is difficult to exaggerate the burden that appellants must overcome to carry the day on this argument. When, as with the Coal Act, Congress legislates within the core of its commerce power to regulate economic matters, such legislation carries a heavy presumption of validity." 102 F.3d at 740. The court vocalized its presumption against the constitutional challenge by noting clear Supreme Court precedent which provides that "it is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality." *Id.* (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976)).

After putting the appellants on notice that their claim against the Coal Act will be handled with a presumption of constitutionality, the *Holland* court addressed appellant's argument that because the Coal Act imposes a new liability for actions taken in the *past* it is "harsh and oppressive" and therefore violates the Fifth Amendment. The court defeated this argument on two grounds.

·First, the "harsh and oppressive" rubric is simply shorthand for the general prohibition against arbitrary and irrational legislation. Second, while the Coal Act does impose a new obligation on a coal operator to pay premiums to the Combined Fund or the 1992 Plan based on its *past* act of signing an NBCWA, the Supreme Court has ruled that "it is permissible for Congress to impose new duties or liabilities based on past acts." In *Concrete Pipe & Products of California, Inc. v. Construction Laborers Pension Trust*, 508 U.S. 602, 637, 113 S.Ct. 2264, 2287, 124 L.Ed.2d 539 (1993) the Supreme Court stated that: "Our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." Finally, it has been well established that the strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. *Usery*, 428 U.S. at 16, 96 S.Ct. at 2892–93.

■ According to the rubric employed by the *Holland* court the basic test in this case is (1) whether the Coal Act is rationally related to a legitimate legislative purpose and (2) whether the Act employs rational means to achieve that purpose. "That the Coal Act was enacted to further a legitimate governmental purpose cannot seriously be disputed," *Holland* stated. "Given the importance of coal production to interstate commerce and the potential for severe economic disruption if the funding of health benefits remained unstable, we cannot say that the animating purposes of the Coal Act are other than legitimate." *Holland*, 102 F.3d at 741.

The Fourth Circuit in *Holland* is equally authoritative on upholding the methods by which the Coal Act operates. Stated the *Holland* court, "We also have no difficulty in concluding that the Coal Act employs rational means to achieve its purpose." *Id.* The Fourth Circuit recognized that the group Congress identified in the Act to fund the Combined Fund and the 1992 Plan consists of employers who profited from the labor of the beneficiaries of the Plan, and asserted that "it would have been irrational to draw the line anywhere [else]." *Id.* (quoting *Davon, Inc. v. Shalala*, 75 F.3d 1114, 1118 (7th Cir.1996)). Furthermore, it has been established that it was rational for Congress to assign the costs of the 1992 Plan to NBCWA signatories "because *[the NBCWA] agreements guarantee lifetime benefits to coal miners." Holland*, 102 F.3d at 741.

### Mary Helen's Due Process Claim

According to well-established precedent, legislation challenged under a due process attack *must be sustained* unless it can be shown that Congress acted arbitrarily or irrationally. In the words of the Supreme Court:

[L]egislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Usery v. Turner Elkhorn Mining Co.* 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976), (citing *Ferguson v. Skrupa*, 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical of Oklahoma*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955)). *See also Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729, 104 S.Ct. 2709, 2717–18, 81 L.Ed.2d 601 (1984).

Economic legislation comports with due process if it bears a rational relationship to a legitimate governmental purpose. *Regan v. Taxation With Representation*, 461 U.S. 540, 547, 103 S.Ct. 1997, 2001–02, 76 L.Ed.2d 129 (1983); *Duke Power v. Carolina Envt'l Study Group, Inc.*, 438 U.S. 59, 83–84, 98 S.Ct. 2620, 2635–36, 57 L.Ed.2d 595 (1978). Such a rational relationship exists as long as a "rationale Congress *could* have had for enacting the statute *can* validate the legislation, regardless of whether Congress actually considered that rationale at the time the bill was passed." *United States v. Osburn*, 955 F.2d 1500, 1505 (11th Cir.), *cert. denied*, 506 U.S. 878, 113 S.Ct. 223, 121 L.Ed.2d 160 (1992); *see also United States v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938) (restricting the court's role "to the issue of whether any state of facts

either known or which could reasonably be assumed affords support for" the legislation); *Northside Sanitary Landfill, Inc. v. Indianapolis,* 902 F.2d 521, 522 (7th Cir.1990) ("governmental action passes the rational basis test if a sound reason may be hypothesized" for the legislation).

■ Mary Helen concedes that retroactive legislation is never *per se* invalid, but argues that the retroactive measures imposed upon it by the Coal Act are unduly harsh and therefore violative of their due process rights. To support this argument, Mary Helen argues that the Coal Act is not a general revenue measure, but rather a targeted tax that imposes the burden of funding upon relatively few taxpayers. Moreover, Mary Helen asserts that the Coal Act imposes this tax on its assets without regard for their ability to pay it. Finally, Mary Helen posits that it should not be required to pay premiums under the Coal Act for two reasons. First, Mary Helen argues that it signed the NBCWA under government duress because it was the only condition under which the government would allow them to operate. Second, Mary Helen urges the court to believe that it contributed in no way to "any legitimate expectation on the part of the miners that they would receive lifetime benefits."

The Fourth Circuit has twice rejected arguments of this precise dimension. *See Holland,* 102 F.3d at 742; *Carbon Fuel Co. v. USX Corp.,* 100 F.3d 1124 (4th Cir.1996). In *Holland,* the Fourth Circuit ruled that "[l]egislation need not place remedial burdens on the 'most responsible' party to survive rational basis scrutiny. The legislative means need only be reasonably related to some legitimate governmental end. For the reasons outlined above, we hold that the Coal Act meets that standard" 102 F.3d at 742.

In similar fashion, the Fourth Circuit in *Carbon Fuel* asserted that the Coal Act is a rational legislative response to the national problems associated with disintegrating benefit funds for retired coal workers:

> [T]he imposition of liability for promised health-care benefits on those who made the promises in the past and where the current carriers of the burden can no longer sustain the benefits, is a rational measure to spread the costs on those who benefited from the labor and concessions given in return for the promised benefits.

100 F.3d at 1138.

Mary Helen's argument that they never created any legitimate expectation among its coal miners of receiving health benefits is in *direct conflict* · with controlling precedent. Companies like Mary Helen not only bear responsibility for the plan liabilities mentioned in the Coal Act, but also "contributed toward the legitimate expectations of the UMWA members." *In Re Blue Diamond Coal,* 79 F.3d 516, 522 (6th Cir.1996). "[E]very NBCWA signatory company shared some responsibility in creating a legitimate expectation among miners of lifetime heath benefits." *Davon,* 75 F.3d at 1124.

A final argument Mary Helen employs in its due process allegation is that the Coal Act is irrational in assigning any liability to Mary Helen because a considerable number of years has passed since Mary Helen was last a signatory to an NBCWA. Controlling precedent causes this argument to fail as a matter of law. Simply stated, the mere passage of time does not establish that Congress acted unreasonably in deciding that all NBCWA signatories should bear some responsibility for providing health care to their retirees. The First Circuit affirmed this point earlier this year by rejecting a Coal Act challenge filed by a company that claimed to have discontinued involvement in the coal industry as long ago as 1966. *Eastern Enterprises v. Chater,* 110 F.3d 150, 158 (1st Cir.1997) (citing *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 471, 105 S.Ct. 1441, 1454–55, 84 L.Ed.2d 432 (1985)). Several other courts have held coal operators to the requirements of the Coal Act; in one instance, the operator had been out of the coal business since 1954. *Davon,* 75 F.3d at 1119.

A final flaw in Mary Helen's due process claim is evidenced by the manner in which Congress allocated responsibility under the Coal Act. Contrary to Mary Helen's assertions, Congress *did* draw distinctions among coal companies based upon when they

signed an NBCWA. Companies like Mary Helen that did not sign the 1978 NBCWA or a subsequent NBCWA are favored rather than prejudiced under the Coal Act. In fact, they are third in the hierarchy of companies that will be assigned liability for particular miners and their dependents. According to the Coal Act, Mary Helen is liable for a retiree's health care (1) only if the retiree has never been employed by a 1978 or later NBCWA signatory that still exists, and (2) only if no other existing NBCWA signatory employed the miner in question for a longer period of time than Mary Helen. By allocating liabilities under the Coal Act in this manner, Congress behaved in a reasonable and non-arbitrary fashion, thereby defeating Mary Helen's due process claim that it behaved in an "irrational and arbitrary" way.

### Mary Helen's Takings Clause Claim

■ Mary Helen's second challenge to the Coal Act is that it comprises a "taking" under the Takings Clause of the Fifth Amendment. There is no set formula for determining whether a piece of legislation violates the takings clause, but the Supreme Court has set forth three elements that provide particular significance:

(1) the nature of the governmental action involved,

(2) the economic impact of the regulation on the claimant, and

(3) the extent to which the regulation has interfered with distinct investment-backed expectations.

*Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (citations omitted). The Supreme Court has applied these factors consistently to challenges such as the one before this court and has concluded repeatedly that the statutory scheme passes muster. *See Penn Central Transp. Co. v. New York*, 438 U.S. 104, 125, 98 S.Ct. 2646, 2659–60, 57 L.Ed.2d 631 (1978); *United States v. Sperry Corp.*, 493 U.S. 52, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). This court examines each element in turn.

1. *The nature of the governmental action involved:* To prove this element of the Takings Clause test plaintiff hangs its argument on an obscure fragment of a sentence which, standing alone, is not dispositive. Plaintiff argues that even though the Coal Act exacts a tax against them, it will eventually deplete all of its assets—thereby comprising an *entire* rather than a *partial* taking. To support this contention plaintiff quotes language from *Concrete Pipe* which states that "the relevant question is whether the property taken is all, or only a portion of, the parcel in question." *Id.* at 644, 113 S.Ct. at 2290.

Plaintiffs urge this court to infer from the quote above that the proper way to determine if the exercise of regulatory dominion comprises a taking is to look at the proportion of the parcel taken compared to that remaining. The facts of this case and the host of case law in similar cases hold to the contrary. Simply stated, the Coal Act tax does not comprise a taking for purposes of this test. Congress has neither physically invaded nor permanently appropriated any of Mary Helen's assets for the government's own use. By requiring coal operators like Mary Helen to spend determined sums of money to finance health benefits for the Coal Act's beneficiaries, Congress has merely enacted legislation to ensure the continuation of health benefits programs from which many operators, including Mary Helen, try to walk away. To rule otherwise would be to put Mary Helen in the inequitable position of extracting its livelihood through its employees without any obligations towards their health and pension benefits.

2. *The economic impact of the Coal Act:* Plaintiff posits that the second prong of the Takings Clause test is satisfied because the mandates of the Coal Act have prescribed payments by Mary Helen which will ultimately diminish all of its assets. Mary Helen re-asserts its claim that it signed the 1950 NBCWA under duress and asserts that any expectation that it should continue contributing to the Fund is "irrational and arbitrary."

In response to these arguments, it is important to note that to the maximum extent possible, the Coal Act imposes liability that is directly related to the employment relationship between each Assigned Operator and the Combined Fund's beneficiaries. In addition, Congress expressly determined that

costs of providing health care for orphan retirees are most fairly borne by the NBCWA coal operators—the employers who participated in a multiemployer health care system and who presumptively derived a *quid pro quo* in collective bargaining from their agreement.

The controlling Supreme Court precedent on this particular matter is provided by *Connolly v. Pension Benefit Guaranty Corp.* and *Concrete Pipe. Connolly* presented a Takings Clause challenge to the Multiemployer Pension Plan Amendment Act (MPPAA) that came to the Court just after the Court had unanimously rejected a Due Process challenge to the same statute. The *Connolly* Court unanimously rejected the Takings Clause challenge, asserting that "In the course of regulating commercial and other human affairs, Congress routinely creates burdens for some that directly benefit others.... Given the propriety of the governmental power to regulate, it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." 475 U.S. at 222–23, 106 S.Ct. at 1025. Regarding the severity of the MPPAA's economic impact, the Court recognized that even though the Act "deprives an employer of whatever amount of money it is obligated to pay to fulfill its statutory liability, [ ] the assessment of withdrawal liability is not made in a vacuum ... but directly [dependent] on the relationship between the employer and the plan to which it had made contributions." *Id.* at 225, 106 S.Ct. at 1026.

The Supreme Court in *Concrete Pipe* upheld the reasoning employed in *Connolly* by asserting that the severity of the economic impact of a governmental regulation is not out of proportion even when the amount taken nearly amounts to a complete diminution in value. Stated the Court: "[o]ur cases have long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe,* 508 U.S. at 645, 113 S.Ct. at 2291 (citing *Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 384, 47 S.Ct. 114, 117, 71 L.Ed. 303 (1926) (approximately 75% diminution in value); *Hadacheck v. Sebastian,* 239 U.S. 394, 405, 36 S.Ct. 143, 143, 60 L.Ed. 348 (1915) (approximately 92.5% diminution in value)).

3. *The degree of interference with distinct investment-backed expectations:* Mary Helen claims that it ceased its coal mining operations because it was losing money. Moreover, Mary Helen asserts that it had no reason to anticipate the necessity of paying employee health and pension benefits this far into the future. Regardless of Mary Helen's anticipations when it decided to cease coal mining, it is still bound to the language of the 1950 NBCWA, which unequivocally provides that the Fund was designed to provide for the payment of hospitalization, medical and surgical care for mine workers, including pensioners and dependents *during his life, without limit as to duration.*

There are a host of controlling cases in which federal courts consistently have held that UMWA retirees have a legitimate expectation of lifetime health benefits. For instance, in *United Mine Workers of America v. Nobel,* 720 F.Supp. 1169 (W.D.Pa.1989), *aff'd without opinion,* 902 F.2d 1558 (3d Cir. 1990), *cert. denied* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 212 (1991), the court held that "the pension and health benefits for retired miners were provided throughout the life of the miner." *Id.* at 1173. The *Nobel* court further held that:

> The eligibility of the retired miner to receive pension and health benefits from the 1950 Fund was not affected by whether the last employer ceased operations, went out of business, or failed to become signatory to successor agreements.

*Id.* See *Lindsey Coal Liquidating Trust v. Shalala,* 901 F.Supp. 959 (W.D.Pa.1995), *aff'd,* 90 F.3d 688 (3d Cir.1996); *Blue Diamond Coal Co. v. Secretary of Health & Human Services,* 79 F.3d 516 (6th Cir.1996); *Davon, Inc.,* 75 F.3d at 1124. *See also District 29, United Mine Workers of America v. United Mine Workers of America 1974 Benefit Plan & Trust,* 826 F.2d 280, 282 (4th Cir.1987), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988) ("we agree with the district court ... that the intention of the parties in providing for retirement health benefits was to guarantee their provi-

sion for life."); *In Re Chateaugay Corp.*, 945 F.2d 1205, 1210 (2d Cir.1991), *cert. denied*, 502 U.S. 1093, 112 S.Ct. 1167, 117 L.Ed.2d 413 (1992) ("the retired employees are guaranteed the provision of health benefits for life under the collective bargaining agreement.").

Given the plethora of case law to the contrary and the continued provision of health care to UMWA retirees as well as the pervasive nature of the government's regulation of nearly every aspect of the coal mining industry, any expectation that Mary Helen may harbor to cut itself loose from the moorings of the multiemployer plans it signed is patently unreasonable and equally unlawful.

### CONCLUSION

For the reasons stated above, plaintiff's prayer for a declaratory judgment that the Coal Act is unconstitutional is DENIED. Plaintiff's cross motion for summary judgment is also DENIED. Moreover, plaintiff's request that the Court enjoin the Trustees and all other related parties from enforcing the Coal Act against Mary Helen is DENIED. Finally, all forms of monetary and other relief that plaintiff seeks in this lawsuit are summarily DENIED.

For the reasons stated above, defendant's motion for summary judgment is GRANTED. In accordance with this ruling, Mary Helen is ordered to pay all monies that it currently owes to the Combined Fund under the applicable statutory mandates. These monies may include but are not limited to outstanding interest, liquidated damages and attorney's fees and are due and payable immediately. Finally, Mary Helen is required to make and continue to make each monthly payment to the Combined Fund according to its obligations under the relevant statutory provisions.

This case is hereby DISMISSED WITH PREJUDICE as to all plaintiffs and defendants.