**Michael H. HOLLAND, et al., Plaintiffs,**

v.

**CARDIFF COAL COMPANY, et al., Defendants.**

Civil Action No. 1:96-0310.

United States District Court, S.D. West Virginia.

Dec. 17, 1997.

Larry D. Newsome, David W. Allen, Jonathan Sokolow, c/o Office of General Counsel, UMWA Health & Retirement Funds, Washington, DC, Gary A. Collias, McIntyre & Collias, Charleston, WV, for Plaintiffs.

Jerry J. Cameron, Brewster, Morhous & Cameron, Bluefield, WV, for Defendants.

**510**

*MEMORANDUM OPINION*

FABER, District Judge.

Pending before the court is the plaintiffs' motion for summary judgment filed on April 11, 1997, and defendant Reed Branch Pocahontas Coal Company's motion for summary judgment filed on May 5, 1997. The court notes that the defendants filed supplemental authority on November 26, 1997, and the plaintiffs responded to this filing on December 10, 1997.

The plaintiffs, Michael H. Holland, Marty D. Hudson, Elliot A. Segal, Thomas O.S. Rand, William P. Hobgood, Charlton R. Sickles, and Gail R. Wilensky are Trustees of the final plaintiff, United Mine Workers of America Combined Benefit Fund ("Combined Fund"). The plaintiffs filed a complaint on April 8, 1996, requesting that the court order that the defendants, Cardiff Coal Company ("Cardiff"), Darbet Incorporated ("Darbet"), Betty Coal Company ("Betty Coal"), and Reed Branch Pocahontas Coal Company ("Reed Branch") are liable to the Combined Fund for per-beneficiary premiums from November 1993 to the date of judgment, interest thereon, liquidated damages, a permanent injunction enjoining the defendants to pay timely their contributions to the Combined Fund, and attorney's fees and costs. (Complaint at 5–6.)

Cardiff was incorporated in the State of West Virginia in 1951, and became a signatory to various National Bituminous Coal Wage Agreements ("NBCWA") with the United Mine Workers of America ("UMWA") from 1951 through 1971.[1] (Plaint.Mem.S.J. exh. 2, ¶ 3.) In 1972, Cardiff became inactive. (Plaint.Mem.S.J. exh. 4, Interr. 15.) In 1979, Darvin Rowe purchased 100% of the Cardiff stock, and Cardiff became active from 1992 to 1995. (Plaint.Mem.S.J. exh. 4, Interr. 5, 13, 15.) Darvin Rowe has also owned 100% of Cardiff, Darbet, and Reed Branch stock since at least 1990. (Plaint.Mem.S.J. exh. 4, Interr. 5, 7.) In addition, since at least 1990, Darvin Rowe has owned 76% of Betty Coal,

with the other 24% owned by his wife, Betty Rowe. (Plaint.Mem.S.J. exh. 5, Interr. 6, exh. 6, Interr. 1.)

In 1993, pursuant to § 9706 of the Coal Industry Retiree Health Benefit Act (the "Coal Act"), the Social Security Administration assigned sixteen beneficiaries to Cardiff. (Plaint.Mem.S.J. exh. 2, ¶ 3.) Cardiff, however, failed to pay its alleged per-beneficiary premium obligation in October of 1993, 1994, 1995, and 1996. (Plaint.Mem.S.J. exh. 2, ¶ 4.)

On April 8, 1996, the plaintiffs filed this action. A motion for summary judgment was filed by the plaintiffs on April 11, 1997, praying for delinquent per-beneficiary premiums plus interest, liquidated damages, and an award of reasonable attorney's fees and costs pursuant to 29 U.S.C. § 1132(g)(2). Defendant Reed Branch responded to the plaintiffs' motion and filed its own motion for summary judgment on May 5, 1997. Defendants Cardiff, Darbet and Betty Coal have failed to respond to the plaintiffs' motion for summary judgment except for defendants' filing of supplemental authority on November 26, 1997, in which Reed Branch joined. The plaintiffs responded to this filing of supplemental authority on December 10, 1997.

Rule 56 of the Federal Rules of Civil Procedure provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The moving party has the burden of establishing that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This burden can be met by showing that the nonmoving party has failed to prove an essential element of the nonmoving party's case for which the nonmoving party will bear the burden of proof at trial.

---

1. In Cardiff's answer to the plaintiffs' complaint, Cardiff denies that it ever was a signatory to a United Mine Workers of America contract. No evidence has been offered by Cardiff, however, to rebut this factual allegation established by exhibit two, paragraph three of the plaintiff's memorandum for summary judgment. Under Rule 56(e) of the Federal Rules of Civil Procedure, Cardiff may not avoid summary judgment simply by resting on a mere denial in its pleading.

*Id.* 477 U.S. at 322. If the moving party meets this burden, according to the United States Supreme Court, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

Once the moving party has met this burden, the burden shifts to the adverse party to produce sufficient evidence for a jury to return a verdict for that party.

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find, by a preponderance of the evidence, that the plaintiff is entitled to a verdict. . . .

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* 477 U.S. at 249–50. The "adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

In the present case, neither party alleges that a material issue of fact exists, and this court agrees. The matters before the court, as briefed before the court, are purely issues of law. The plaintiffs seek to hold defendant Cardiff liable for delinquent per-beneficiary premiums because Cardiff is allegedly an assigned operator under the Coal Industry Retiree Health Benefit Act of 1992 ("Coal Act"). 26 U.S.C. § 9701 *et seq.* The plaintiffs seek to hold defendants Darbet, Betty Coal and Reed Branch liable for such premiums because they are allegedly liable under the Coal Act as "related persons" to Cardiff under the Coal Act.

The only defendant responding to the plaintiffs' motion is Reed Branch. Reed Branch maintains that it is not liable to the plaintiffs because it is not a "related person" under the Act in light of the fact that it was not conducting any business in 1992. The plaintiffs do not dispute that Reed Branch was not in business in 1992. Reed Branch also asserts that holding it liable would be unconstitutional under the Fifth Amendment.

### *The Defendants' Liability for Per-Beneficiary Premiums*

### *(A) CARDIFF'S LIABILITY*

■ The court will first address defendant Cardiff's liability to the plaintiffs for per-beneficiary premiums allegedly due under the Coal Act. Again, Cardiff has not responded to the plaintiffs' motion for summary judgment. Based on the Coal Act, the court finds that the plaintiffs are entitled to summary judgment against Cardiff for the premiums.

26 U.S.C. § 9706 permits the Commissioner of Social Security, before October 1, 1993, to assign each coal industry retiree who is an eligible beneficiary to a "signatory operator" which remains in business. A "signatory operator" is "a person which is or was a signatory to a coal wage agreement." 26 U.S.C. § 9701(c)(1). Under 26 U.S.C. § 9701(c)(7), a person is "considered to be in business if such person conducts or derives revenue from any business activity, whether or not in the coal industry."

26 U.S.C. § 9704 deals with the liability of "assigned operators." The statute states that "[e]ach assigned operator shall pay to the Combined Fund for each plan year beginning on or after February 1, 1993, an annual premium. . . ." 26 U.S.C. § 9704 (1997). Section 9701(c)(5) of the Coal Act defines the term "assigned operator" as meaning, "with respect to an eligible beneficiary defined in section 9703(f), the signatory operator to which liability under subchapter B with respect to the beneficiary is assigned under section 9706." 26 U.S.C. § 9701(c)(5) (1997).

In this case, Cardiff is a "signatory operator." (Plaint.Mem.S.J. exh. 2, ¶ 3; Plaint.

Mem.S.J. exh. 4, Interr. 13, 15.) In 1993, when Cardiff was conducting business, and thus was "in business" as defined in the Coal Act, Cardiff was assigned sixteen beneficiaries by the Social Security Administration pursuant to § 9706. (Plaint.Mem.S.J. exh. 2, ¶ 3.) Cardiff could have contested this assignment under § 9706(f)(2), but the court has no evidence before it to indicate that Cardiff did so.[2] Accordingly, because Cardiff is a "signatory operator" who has been assigned liability with respect to the beneficiaries assigned under § 9706, Cardiff is an "assigned operator." As an "assigned operator," § 9704 dictates that Cardiff is liable to the Combined Fund for annual premiums. Consequently, Cardiff is liable to the plaintiffs for $111,094.72, the amount of delinquent per-beneficiary premiums through March 1997, as stated in the evidence. (Plaint.Mem.S.J. exh. 2, ¶ 10.)

### (B) REED BRANCH'S LIABILITY

Next, in regard to Reed Branch's liability for per-beneficiary premiums, the plaintiffs maintain that Reed Branch is liable to them for such premiums because Reed Branch is a "related person" to Cardiff under the Coal Act. (Plaint.Mem.S.J. at 11.) Reed Branch responds by claiming that it is entitled to summary judgment for two reasons. First, Reed Branch argues that in order to be liable for premiums as a "related person" under the Coal Act, it must have been "in business" on July 20, 1992. (Def.Mem.S.J. at 2–3.) Because it is undisputed that Reed Branch had not conducted any business prior to 1994, Reed Branch maintains that it cannot be liable for premiums under the Act. (Def.Mem.S.J. at 3.) Second, Reed Branch asserts that because it never employed any of Cardiff's miners, was not in business until 1994, and is not financially able to make the payments sought by the plaintiffs, it would be an unconstitutional taking in violation of the Fifth Amendment to hold Reed Branch liable. (Def.Mem.S.J. at 4–5.) This court will address each of these assertions.

First, contrary to Reed Branch's assertion, the Coal Act does not by its terms require that a "related person" be "in business" on July 20, 1992, in order to be held liable for per-beneficiary premiums. 26 U.S.C. § 9706(a) states that the Commissioner of Social Security shall "assign each coal industry retiree who is an eligible beneficiary to a signatory operator which (or any related person with respect to which) remains in business...." Thus, under the terms of § 9706, when the Commissioner makes assignments, the Commissioner can only assign coal industry retirees to either a "signatory operator" or any "related person" to a "signatory operator" which remains "in business," as defined by § 9701(c)(7). In this case, as noted previously in this Memorandum Opinion, the Commissioner assigned retirees to Cardiff, a "signatory operator," pursuant to § 9706.

A signatory operator who has been assigned retirees pursuant to § 9706 is deemed an "assigned operator" under the Coal Act. 26 U.S.C. § 9701(c)(5) (1997). Pursuant to § 9704(a), an "assigned operator" is liable to the Combined Fund for annual premiums. In addition, "any *related person* with respect to an assigned operator shall be jointly and severally liable for any premium required to be paid by such operator." 26 U.S.C. § 9704(a) (1997) (underline added.)

A "related person" is defined under the Coal Act as follows:

(2) Related Person.—

(A) In general.—A person shall be considered to be a related person to a signatory operator if that person is—

(i) a member of the controlled group of corporations (within the meaning of section 52(a)) which includes such signatory operator;

(ii) a trade or business which is under common control (as determined under section 52(b)) with such signatory operator; or

(iii) any other person who is identified as having a partnership interest or joint venment under the Coal Act.

---

**2.** It should be noted that none of the defendants have challenged the validity of Cardiff's assign-

ture with a signatory operator in a business within the coal industry, but only if such business employed eligible beneficiaries, except that this clause shall not apply to a person whose only interest is as a limited partner.

A related person shall also include a successor in interest of any person described in clause (i), (ii), or (iii).

26 U.S.C. § 9701(c)(2)(A) (1997). Under § 9701(c)(2)(B), the date used to determine whether a person is a "related person" is July 20, 1992, unless a "signatory operator" is no longer "in business."

The plaintiffs maintain that Reed Branch is a "related person" under § 9701(c)(2)(A)(i), as a member of the "controlled group of corporations" (within the meaning of section 52(a)) which includes such "signatory operator." (Plaint.Mem.S.J. at 11.) 26 U.S.C. § 52(a) defines a "controlled group of corporations" as follows:

[T]he term 'controlled group of corporations' has the meaning given to such term by section 1563(a), except that—

(1) 'more than 50 percent' shall be substituted for 'at least 80 percent' each place it appears in section 1563(a)(1), and

(2) the determination shall be made without regard to subsection (a)(4) and (e)(3)(C) of section 1563.

In turn, § 1563(a) defines three kinds of "controlled group of corporations": (1) parent-subsidiary, (2) brother-sister, and (3) combined group. The plaintiffs claim that Reed Branch is part of a "brother-sister controlled group." (Plaint.Mem.S.J. at 11.) 26 U.S.C. § 1563(a)(2) defines such a group as:

Two or more corporations if 5 or fewer persons who are individuals, estates or trusts own (within the meaning of subsection (d)(2)) stock possessing—

(A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and

(B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such ownership is identical with respect to each such corporation.

In this case, Cardiff and Reed Branch are clearly a "brother-sister controlled group" within the meaning of the relevant statutes. They are two corporations, in which one individual, Darvin Rowe, owns 100% of the stock in each corporation; therefore, §§ 1563(a) and 52(a) are satisfied. (Plaint.Mem.S.J. exh. 4, Interr. 5, 7.) Darvin Rowe owned 100% of the stock in each company at least since 1990. (Plaint.Mem.S.J. exh. 4, Interr. 5.) Accordingly, Cardiff and Reed Branch were a "brother-sister controlled group" on July 20, 1992, the relevant time period for the determination of a "related person" under § 9701(c)(c)(2)(B). As a member of a "controlled group of corporations" which includes a signatory operator such as Cardiff, Reed Branch is a "related person" under § 9701(c)(2), and is jointly and severally liable for any premium due by Cardiff, the "signatory operator," under § 9704(a).

Reed Branch asserts, however, that it cannot be a "related person" under the Coal Act because it was not "in business" as of July 20, 1992, the relevant date for determining "related persons" under the Act. By its terms, though, the relevant statutes do not require a "related person" to be "in business." The definition of a "related person" in § 9701(c)(2), and as further defined in §§ 52(a) and 1563(a), does not state that a person must be "in business" as of July 20, 1992, to be deemed a "related person." Similarly, § 9704 does not provide that a "related person" must be "in business" at the specified date to be jointly and severally liable.

The term "in business" is defined in § 9701(c)(7) of the Act, and the "in business" requirement explicitly exists in other provisions of the Act, specifically, §§ 9706(a) and 9711(a). Inasmuch as the "in business" requirement explicitly exists in other sections of the Coal Act, but is not explicitly stated in regard to a "related person's" joint and several liability for premiums required to be paid by "assigned operators," this court re-

fuses to judicially impose an "in business" requirement in this matter. Congress explicitly placed an "in business" requirement in other sections of the Coal Act; therefore, this court must assume that if Congress had intended to place such a requirement on a "related person's" joint and several liability for any premiums required to be paid by an "assigned operator," it would have so indicated.

This result is consistent with this court's rulings in similar cases concerning the interpretation of the Coal Act. In *Holland v. Double G Coal Co., Inc.*, the Trustees of the UMWA 1992 Benefit Plan filed suit to recover unpaid premiums allegedly due from Double G Coal Co., Inc. ("Double G") under § 9712 of the Coal Act. *Holland v. Double G Coal Co., Inc.*, 898 F.Supp. 351, 352 (S.D.W.Va.1995). Double G began coal mining operations in August 1986, and signed the 1988 NBCWA in August of 1988. *Id.* Double G, however, ceased all business activity in August 1991, and contended that since it was no longer in business, it was not required to make further payments under the Act. *Id.* In analyzing the Coal Act, this court noted that certain sections of the Act, namely §§ 9706 and 9711, contain an explicit "in business" requirement; however, § 9712 does not contain such an explicit requirement. *Id.* at 355. This court stated that "the duty of this court is to give effect to the plain meaning of the statute, not to pass judgment on its wisdom or fairness." *Id.* As such, "by not including the term 'remaining in business' in § 9712, Congress must have intended § 9712 of the Coal Act to apply to all 1988 last signatory operators, whether or not they remain in business." *Id.* Consequently, this court refused to engraft an "in business" requirement under § 9712 and held Double G liable for payments.

Similarly, in *Holland v. American Coal Co., Inc.*, this court concluded that American Coal, which was a 1988 agreement operator, was liable under § 9704 to pay contributions to the Combined Fund, even though the company was no longer in business. *Holland v. American Coal Co., Inc.*, 868 F.Supp. 173, 176 (S.D.W.Va.1994). This court refused to impose an "in business" requirement on the specific section of the Coal Act under consideration because Congress, in the clear language of the section, did not include such a requirement. *Id.*

Though this case deals with different provisions of the Coal Act than *Double G* and *American Coal*, the principle of statutory interpretation utilized in those cases applies here. Again, §§ 9706 and 9711 contain explicit "in business" requirements. The Commissioner of Social Security, pursuant to § 9706(a), assigned retirees to Cardiff while Cardiff was "in business" within the meaning of the term. Plaintiffs seek to hold Reed Branch jointly and severally liable as a "related person" to Cardiff. The Coal Act does not contain an explicit provision requiring that a "related person" who is subject to potential joint and several liability be "in business."

Nevertheless, Reed Branch maintains that 26 U.S.C. §§ 52 and 1563 contemplate that in order to be included in any controlled group, the entities must be "in business" at the time of their inclusion, in this case July 20, 1992. (Def.Mem.S.J. at 3.) Reed Branch's argument is unpersuasive. The plaintiffs claim that Reed Branch is a "related person" as a member of a "controlled group of corporations" within the meaning of § 52(a). Section 52(a), in turn, essentially defines a "controlled group of corporations" as directly stated by § 1563(a). Neither the definition of a "brother-sister controlled group" in § 1563(a)(2) nor the regulations concerning a "brother-sister controlled group" found in 26 C.F.R. § 1.1563–1(a) dictates that the "in business" requirement of § 9701(c)(7) applies.

Furthermore, to impose an "in business" requirement on a "related person" appears to be inconsistent with the purpose of the Coal Act. The Coal Act was enacted because of the under-funding of health benefits for retired coal miners, which was due, "in large part, to the practice of employers withdrawing from the industry and terminating their obligations under the NBCWA, thereby 'dumping' their retired employees." *Holland v. American Coal Company, Inc.*, 868 F.Supp. 173, 175 (S.D.W.Va.1994). "The history of the Coal Act makes clear that Con-

gress's purpose was to insure adequate funding of benefit plans by requiring signatories of past plans to contribute to new plans." *Holland v. Double G Coal Co., Inc.*, 898 F.Supp. 351, 353 (S.D.W.Va.1995). To impose an "in business" requirement on a "related person," as Reed Branch suggests, would act directly contrary to the Act's purpose because doing so would provide a loophole through which a "signatory operator" could escape having to pay premiums. Specifically, if an "in business" requirement is imposed on a "related person," then a signatory operator could conceivably transfer its assets to another corporation, which existed prior to July 20, 1992, but which was not "in business" as of July 20, 1992. This would result in the signatory operator being unable to satisfy its premium liability, and render a corporation owned by essentially the same persons not liable for payment of premiums. If this practice were utilized by a number of "signatory operators", then the Combined Fund would once again be underfunded and the Coal Act's purpose would be undermined. Consequently, the court disagrees with Reed Branch's contention, and for all the aforesaid reasons, this court refuses to impose an "in business" requirement on a "related person's" joint and several liability under § 9704 of the Coal Act.

■ Second, Reed Branch maintains that the Coal Act, as applied to Reed Branch, violates the takings clause of the Fifth Amendment of the United States Constitution, which states, "nor shall private property be taken for public use, without just compensation." (Def.Mem.S.J. at 4–5.) Reed Branch raises this defense for the first time in its response to the plaintiffs' motion for summary judgment and in support of its own motion for summary judgment. Thus, Reed Branch raises this affirmative defense for the first time on May 5, 1997, over a year after filing its answer in this case.

■ Rule 8(c) of the Federal Rules of Civil Procedure states that a party shall set forth affirmative defenses in their answer to a complaint. Failure to set forth an affirmative defense in a defendant's responsive pleading generally results in a waiver of the defense. *Allied Chemical Corp. v. Mackay,*

695 F.2d 854, 855 (5th Cir.1983). An affirmative defense is defined as, "[i]n pleading, [a] matter asserted by defendant which, assuming the complaint to be true, constitutes a defense to it." *Black's Law Dictionary* 60 (6th ed. 1990). Rule 8(c) provides a list of affirmative defenses, but that list is not intended to be exhaustive. 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1271 (2d ed. 1990). In this case, Reed Branch's Fifth Amendment taking defense is an affirmative defense within the definition of that term because in raising that defense, Reed Branch essentially maintains that even if it is found liable under the terms of the Coal Act, Reed Branch cannot be held liable because the Act, as applied, violates the Constitution. See also, *Barquin v. Roman Catholic Diocese of Burlington, Vermont Inc.*, 839 F.Supp. 275, 279 (D.Vt. 1993) (treating constitutional defenses as affirmative defenses). Thus, Reed Branch's failure to plead its affirmative defense generally results in a waiver of that defense.

■ Of course, "where the matter is raised in the trial court in a manner that does not result in unfair surprise, however, technical failure to comply precisely with Rule 8(c) is not fatal." *Allied Chemical Corp. v. Mackay,* 695 F.2d 854, 855–56 (5th Cir.1983). In this case, though, the plaintiffs do allege unfair surprise, and Reed Branch does not present any arguments that the plaintiff will not be unfairly surprised if it is permitted to raise its defense. (Plaint.Rep. at 4.)

Reed Branch's assertion of its taking claim has unfairly surprised the plaintiffs. Again, Reed Branch did not raise this defense until its response to the plaintiffs' motion for summary judgment and in favor of its own motion for summary judgment, over a year after it filed its original pleading. When Reed Branch did eventually raise this defense, discovery had already ended and Reed Branch's assertion of the defense was a mere five sentences. In evaluating a taking inquiry in this context, the court must conduct an "ad hoc" factual inquiry into the particular circumstances of the case in light of three specific factors. *Davon, Inc., v. Shalala,* 75 F.3d 1114, 1127 (7th Cir.1996), *cert. de-*

*nied,* —— U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996). By waiting to raise this defense until after the discovery period closed in this matter, the plaintiffs were precluded from taking discovery on matters that are relevant to presenting fact specific arguments against Reed Branch's taking defense. Reed Branch has provided to this court no reasons in support of its delay in asserting this defense and has made no argument that the plaintiffs have not been unfairly surprised by its assertion of the defense.

■ In addition, Reed Branch has never filed a motion to amend its pleading to assert its constitutional defense. Even if we were to assume that Reed Branch's assertion of its taking defense included a motion for leave to amend, Reed Branch would still not be entitled to an amendment. In this case, the scheduling order of June 25, 1996, states that motions to amend pleadings shall be filed by July 30, 1996. Though numerous orders were entered extending certain dates in the scheduling order, no order ever altered the date for filing motions to amend pleadings.

■ This court has previously ruled on a similar scenario in *Williams v. Professional Transportation, Inc.,* No. 1:95–0081 (S.D.W.Va. Feb. 10, 1997). In *Williams,* this court stated that in determining whether to grant leave to amend pleadings after the scheduling order's deadline for amendment has passed, the moving party must satisfy a two-part test under Rules 16(b) and 15(a) of the Federal Rules of Civil Procedure. *Marcum v. Zimmer,* 163 F.R.D. 250 (S.D.W.Va. 1995); *Smith v. United Parcel Service, Inc.,* 902 F.Supp. 719 (S.D.W.Va.1995). "Once the scheduling order's deadline for amendment of the pleading has passed, a moving party must satisfy the good cause standard of rule 16(b). If the moving party satisfies Rule 16(b), the movant then must pass the tests for amendment under Rule 15(a)." *Marcum,* 163 F.R.D. at 254. In this case, Reed Branch has put forth no arguments that it satisfies this test. Accordingly, even if this court found that Reed Branch's response to plaintiff's summary judgment motion and its own summary judgment motion included a motion to amend, Reed Branch would not be entitled to amendment.

Finally, in regard to Reed Branch's taking claim, without ruling on the merits of this defense as applied, this court notes that Reed Branch's defense has not enjoyed success in other cases. More than thirty federal judges have addressed constitutional challenges to the Coal Act and upheld the Act. *See, e.g., Mary Helen Coal Corp. v. Hudson,* 976 F.Supp. 366, 371 (E.D.Va.1997) (providing citations of cases upholding constitutionality.) In addition, at least six federal circuits have contemplated challenges to the Coal Act under the taking clause and none of these circuits has found a constitutional violation. *Eastern Enterprises v. Chater,* 110 F.3d 150 (1st Cir.1997) *cert. granted,* —— U.S. ——, 118 S.Ct. 334, 139 L.Ed.2d 259 (1997); *Lindsey Coal Mining Co. v. Chater,* 90 F.3d 688 (3d Cir.1996); *In re Blue Diamond Coal Co.,* 79 F.3d 516 (6th Cir.1996) *cert. denied,* —— U.S. ——, 117 S.Ct. 682, 136 L.Ed.2d 608 (1997); *Davon, Inc. v. Shalala,* 75 F.3d 1114 (7th Cir.1996) *cert. denied,* —— U.S. ——, 117 S.Ct. 50, 136 L.Ed.2d 14 (1996); *In re Chateaugay Corp.,* 53 F.3d 478 (2d Cir.1995) *cert. denied,* 516 U.S. 913, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995); *Barrick Gold Exploration, Inc. v. Hudson,* 47 F.3d 832 (6th Cir. 1995) *cert. denied,* 516 U.S. 813, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995). In fact, this court was able to find only one district court opinion which supported the proposition that the Coal Act, as applied, might be an unconstitutional taking. *Unity Real Estate Co. v. Hudson,* 889 F.Supp. 818, 833 (W.D.Pa.1995).

Nonetheless, Reed Branch maintains that the Coal Act, as applied to it, violates the Fifth Amendment. Reed Branch's Fifth Amendment defense is comprised of a five-sentence argument. Specifically, Reed Branch's argument is as follows:

It is uncontroverted that Cardiff went inactive in approximately 1973, so nineteen years have passed between the last employment of any of the assigned miners and the enactment of the coal act. Reed Branch never employed any of the miners, it was not in business until 1994, by copies of its tax returns provided in response to plaintiffs' interrogatories, copies attached hereto as Exhibit D is not financially able to make payment of the amount sought of

$152,721.58 plus interest, attorney's fees and other cost. *Unity Real Estate Company v. Hudson*, 889 F.Supp. 818 (W.D.Pa. 1995) page 833, found a similar taking was unconstitutional.

Based thereon, Reed Branch contends that it would be bankrupt if it is found liable for Cardiff's liability under the Coal Act.

In addition, as in *Unity*, since Reed Branch would have to liquidate to pay only a portion of the alleged obligations of Cardiff, it is an unconstitutional taking in violation of the Fifth Amendment.

(Def.Mem.S.J. at 4–5.)

Thus, it appears that Reed Branch's defense is based upon an analogy to the *Unity* case. However, Reed Branch fails to mention that the *Unity* decision it cites in support of its contention dealt with a preliminary injunction issue, where the court only had to find that the plaintiff demonstrated a likelihood of success on the merits to issue the preliminary injunction. That same court reached the merits of the taking issue when later faced with summary judgment motions. *Unity Real Estate Co. v. Hudson,* 977 F.Supp. 717 (W.D.Pa. 1997). In this later opinion, the district court explicitly held that the Coal Act, as applied, does not effect an unconstitutional taking. *Id.* at 725. Thus, it appears that the court Reed Branch utilizes in support of its position reached a different result when confronted with the issue on summary judgment than it had at the preliminary injunction stage. Consequently, Reed Branch's argument by analogy to the *Unity* case is unpersuasive.

■ The court notes that the Supreme Court has identified three factors that have "particular significance" in the taking inquiry: (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of governmental action. *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 224–25, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (quoting *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). The court further notes that in its brief constitutional defense, Reed Branch did not provide any factual or legal analysis to show that these factors weigh in its favor.[3] Accordingly, and for all the aforementioned reasons, even if the court were to address the constitutional defense on its merits, this court has serious doubts as to whether Reed Branch has met it burden in proving its affirmative defense.

### DARBET AND BETTY COAL'S LIABILITY

■ Next, the plaintiffs claim that they are entitled to summary judgment against Darbet and Betty Coal for per-beneficiary premiums because they are "related persons" to Cardiff. Neither Darbet nor Betty Coal

3. Reed Branch's entire constitutional defense rests on the *Unity* case and the fact that the Supreme Court has granted certiorari in *Eastern Enterprises v. Chater*, 110 F.3d 150 (1st Cir.1997) *cert. granted*, ―― U.S. ――, 118 S.Ct. 334, 139 L.Ed.2d 259 (1997), a case which Reed Branch maintains is less compelling than its case. Reed Branch has not provided any factual arguments as to how the three relevant factors weigh in its favor. Furthermore, and as noted previously, the plaintiffs have been precluded from discovery from this claim; therefore, the plaintiffs have not provided factual arguments in regard to the three factors.

The court notes, however, that the third taking factor clearly weighs against the finding of an unconstitutional taking. "Under applicable precedents, a taking is much more readily found when the government 'physically invade[s] or permanently appropriate[s]' assets for its own use than when the claimed deprivation merely 'arises from a public program that adjusts the benefits and burdens of economic life to promote the common good.'" *Eastern Enterprises v. Chater*, 110 F.3d 150, 160 (1st Cir.1997) *cert. granted,* ―― U.S. ――, 118 S.Ct. 334, 139 L.Ed.2d 259 (1997) (quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986)). The Coal Act does not permit the government to "physically invade or permanently appropriate any of the employer's assets for its own use." *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). "On the contrary, the Coal Act squarely falls within the category of legislation that serves to adjust the benefits and burdens of economic life on behalf of the common good." *In re Chateaugay Corp.*, 53 F.3d 478, 496 (2d Cir.1995) *cert. denied*, 516 U.S. 913, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995). Accordingly, this factor weighs in favor of the Coal Act's constitutionality, as applied.

responded to the plaintiffs' motion for summary judgment. This court finds that Darbet and Betty Coal are "related persons" to Cardiff who are jointly and severally liable for the premiums the plaintiffs seek.

Again, under the Coal Act, a person is deemed a "related person" if the person is a member of the "controlled group of corporations" within the meaning of § 52(a). 26 U.S.C. § 9701(c)(2)(A) (1997). Section 52(a) states that a "controlled group of corporations" has the meaning as provided in 26 U.S.C. § 1563(a). Section 1563(a) defines three kinds of "controlled group corporations," one of which is a "brother-sister controlled group."

A "brother-sister controlled group" is defined by § 1563(a)(2) as

> two or more corporations if 5 or fewer persons who are individuals, estates or trusts own (within the meaning of subsection (d)(2)) stock possessing—
>
> (A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and
>
> (B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such ownership is identical with respect to each such corporation.

In this case, Darvin Rowe owns 100% of Cardiff stock and 100% of Darbet stock. (Plaint.Mem.S.J. exh. 4, Interr. 5, 7.) In addition, Darvin Rowe owns 76% of Betty Coal stock, with his spouse owning the other 24%. Under § 1563(d)(2), stock owned by an individual also means stock owned within the application of subsection (e). Subsection (e)(5) states that an individual is considered to own stock in a corporation owned by his or her spouse. 26 U.S.C. § 1563(e)(5) (1997). Accordingly, Darvin Rowe is also deemed to own 100% of Betty Coal stock.

Therefore, because Darvin Rowe owns 100% of Cardiff stock, 100% of Darbet stock, and is deemed to own 100% of Betty Coal stock, these corporations are clearly a "brother-sister controlled group" within the meaning of the relevant statutes. They are three corporations in which one individual, Darvin Rowe, owns 100% of the stock in each corporation; therefore, §§ 1563(a) and 52(a) are satisfied. (Plaint.Mem.S.J. exh. 4, Interr. 5, 7, exh. 5, Interr. 6, exh. 6, Interr. 1.) Darvin Rowe owned 100% of the stock in each company at least since 1990. (Plaint. Mem.S.J. exh. 4, Interr. 5.) Accordingly, Cardiff, Darbet and Betty Coal were a "brother-sister controlled group" on July 20, 1992, the relevant date for the determination of a "related person" under § 9701(c)(c)(2)(B). As a member of a "controlled group of corporations," which includes a "signatory operator" such as Cardiff, Darbet and Betty Coal are "related persons" under § 9701(c)(2), who are jointly and severally liable for any premium due by Cardiff, the "signatory operator," under § 9704(a).

### Liability for Interest, Liquidated Damages and Attorney's Fees

■ Having concluded that the defendants are liable for per-beneficiary premium payments under the Coal Act, the court must now determine whether the plaintiffs are also entitled to interest, liquidated damages and attorney's fees. 26 U.S.C. § 9721 states as follows:

> The provisions of section 4301 of the Employee Retirement Income Security Act of 1974 shall apply to any claim arising out of an obligation to pay any amount required to be paid by this chapter in the same manner as any claim arising out of an obligation to pay withdrawal liability under subtitle E of title IV of such Act.

Section 4301 of ERISA, 29 U.S.C. § 1451(b) states that a failure by an employer to pay withdrawal liability shall be treated in the same manner as delinquent contributions. In turn, 29 U.S.C. § 1132(g)(2), which concerns the award of interest, liquidated damages and attorney's fees in delinquent contributions cases, is applicable to this case.

29 U.S.C. § 1132(g)(2) provides:

> In any action under this subchapter by a fiduciary for or on behalf of a plan to

enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions

(C) an amount equal to the greater of—

   (i) interest on the unpaid contributions, or

   (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26.

Thus, the plaintiffs in this action are entitled to a mandatory award of interest on the unpaid premiums, plus the greater of interest or liquidated damages, and reasonable attorney's fees and costs of the action.

The plaintiffs have submitted to this court that interest on the unpaid premiums through April 11, 1997, as calculated in accord with § 6621 of Title 26, is $19,407.92. (Plaint.Mem.S.J. at 13.) The plaintiffs have further submitted that liquidated damages total $22,218.94, twenty percent of the principal premium debt of $111,094.72. (Plaint. Mem.S.J. at 15–16.) The defendants do not dispute the plaintiffs' right to interest, liquidated damages and attorney's fees or the figures submitted by the plaintiffs.

As for the mandatory award of reasonable attorney's fees and costs of the action, the plaintiffs have requested leave to submit an affidavit within thirty (30) days of the court's Order, setting forth their costs and attorney's fees. (Plaint.Mem.S.J. at 16). The court grants such leave.

*Conclusion*

For the reasons set forth above, the court concludes that Cardiff is liable to the plaintiffs for per-beneficiary premiums under the Coal Act. Reed Branch, Darbet and Betty Coal are jointly and severally liable for these premiums as "related persons." The plaintiffs are further entitled to interest, liquidated damages and reasonable costs and attorney's fees. A separate judgment order of even date herewith will be entered implementing the court's conclusion explained in this opinion.

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel of record.